DOUGLAS J. FARMER, CA Bar No. 139646
douglas.farmer@ogletree.com
BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
ROSHNI C. KAPOOR, CA Bar No. 310612
roshni.kapoor@ogletree.com
KEVIN HA, CA Bar No. 322252
kevin.ha@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA 94111
Telephone:      415-442-4810
Facsimile:      415-442-4870

CHRISTOPHER McCRACKEN, (*pro hac vice*)
christopher.mccracken@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
The KOIN Center
222 SW Columbia  Street , Suite 1500
Portland, OR 97201
Telephone:      503-552-2140
Facsimile:      503-224-4518

Attorneys for Defendants
HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY HANDLOSER and CERAFIN CASTILLO,<br><br>                    Plaintiffs,<br><br>          v.<br><br>HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.,<br><br>                    Defendants. | Case No. 5:19-cv-01242-LHK  (VKD)<br><br>**DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          October 8, 2021<br>Time:          2:00 p.m.<br>Courtroom:  8<br>Judge:        Hon. Lucy H. Koh |

**TO PLAINTIFFS GREGORY HANDLOSER AND CERAFIN CASTILLO AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 7, 2021 at 2:00 p.m., or as soon thereafter as the matter may be heard, in Courtroom 8 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable Lucy H. Koh, Defendants HCL TECHNOLOGIES LTD. and HCL AMERICA, INC. (together, "Defendants") will and hereby does move the Court for summary judgment against Plaintiffs Gregory Handloser and Cerafin Castillo's (together, "Plaintiffs") claims in their entirety, or partial summary judgment in the alternative, pursuant to Federal Rule of Civil Procedure 56.

Defendants move for summary judgment on Plaintiffs' claims for relief in the Second Amended Complaint of Plaintiffs, on the ground that there is no genuine issue of material fact in dispute, and Defendants are entitled to judgment as a matter of law.

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities in Support Thereof, the Appendix of Evidence filed herewith including the Declarations attached thereto, and all pleadings and papers on file with this Court, and any oral argument that this Court may hear.

DATED: August 23, 2021

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: /s/ Roshni C. Kapoor
DOUGLAS J. FARMER
BRIAN D. BERRY
CHRISTOPHER McCRACKEN
ROSHNI C. KAPOOR
KEVIN HA

Attorneys for Defendants
HCL TECHNOLOGIES LTD. and HCL AMERICA, INC.

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 1

    A.    HCL's Business ........................................................................... 1

    B.    Handloser's Five Contacts with HCL ......................................... 2

        1.    *Contact No. 1 ("Networking Opportunity"): Handloser Circulated Resume but No Job Existed*.............................. 2

        2.    *Contact No. 2 ("Manufacturing Call"):  Handloser Lacked Necessary Expertise and the Job was Not Filled*.......................... 3

        3.    *Contact No. 3 ("UTC Aerospace Job"):  Billington, Handloser's Former Colleague, Did Not Recommend Him*........................ 3

        4.    *Contact No. 4 ("UTC Industrial Job"): After Five Interviews, Handloser was Not the Most Qualified Candidate* .................. 5

        5.    *Contact No. 5 ("A&D NN Job"): Van Deventer Declined Handloser Based on Past Work Experience*.................................. 7

    C.    Castillo's Contacts with HCL .................................................... 8

        1.    *Castillo was Not Qualified for the Network Security Position at UCSF* ................................................................ 8

        2.    *UCSF Rejected Castillo for the Network Refresh Job* .............. 10

III.  LEGAL ARGUMENT ......................................................................... 12

    A.    Plaintiffs Cannot Prove National Origin Disparate Treatment under Title VII ......................................................................... 12

        1.    *Handloser Cannot State a Claim for the Networking Opportunity* .......................................................... 12

        2.    *Handloser Cannot State a Claim for the Manufacturing Call*.................. 13

        3.    *Handloser Cannot Show Pretext Regarding the UTC Aerospace Job* ....................................................... 13

        4.    *Handloser Cannot Show Pretext Regarding the UTC Industrial Job* ........................................................ 14

        5.    *Handloser Cannot Show Pretext Regarding the A&D NN Job*.................. 16

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

6.   *Castillo Cannot State a Claim Regarding the Network Security Job* ............................................................................... 17

7.   *Castillo Cannot Show Pretext Regarding the Network Refresh Job* ............................................................................... 18

B.   Plaintiffs Cannot Prove Race-Based Disparate Treatment Under Title VII or Section 1981 ............................................................ 18

1.   *Handloser Cannot Prove Race-Based Disparate Treatment* .................... 19

2.   *Castillo Cannot Prove Race-Based Discrimination* ................................. 20

C.   Plaintiffs Cannot Prove Citizenship Discrimination Under Section 1981 ................................................................................. 20

D.   Plaintiffs Fail to State a Race or National Origin Disparate Impact Claim .............................................................................. 21

1.   *No Specific, Neutral Practices to Which Plaintiffs were Subjected* ............................................................................. 22

2.   *No Disparate Impact* ............................................................... 23

3.   *No Causation Shown Between Challenged Practices and Alleged Impact* ...................................................................... 24

IV.   CONCLUSION .................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bagwell v. CBS Broad. Inc.*,
  No. CV 19-8423 DSF (ASX), 2021 WL 2497949 (C.D. Cal. May 7, 2021) ........................... 23

*Cheeks v. Gen. Dynamics*,
  22 F. Supp. 3d 1015 (D. Ariz. 2014) ................................................................................. 17

*Chuang v. Univ. of California Davis, Bd. of Trustees*,
  225 F.3d 1115 (9th Cir. 2000) .......................................................................................... 19

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
  140 S. Ct. 1009 (2020) ............................................................................................... 12, 20

*Cornwell v. Electra Cent. Credit Union*,
  439 F.3d 1018 (9th Cir. 2006) .......................................................................................... 12

*Fraser v. Goodale*,
  342 F.3d 1032 (9th Cir. 2003) .......................................................................................... 14

*Hernandez v. City of Los Angeles*,
  9 F. App'x 636 (9th Cir. 2001) ................................................................................... 18, 19

*Int'l Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977) ......................................................................................................... 22

*Kennedy v. Applause, Inc.*,
  90 F.3d 1477 (9th Cir. 1996) ............................................................................................ 15

*Leap v. Bodman*,
  No. 06-CV-1593-BR, 2008 WL 1805576 (D. Or. Apr. 17, 2008) ..................................... 17

*Lesane v. Aloha Airlines, Inc.*,
  226 F. App'x 693 (9th Cir. 2007) ..................................................................................... 13

*MacNamara v. Korean Air Lines*,
  863 F.2d 1135 (3d Cir.1988) ............................................................................................ 21

*Mankaruse v. Raytheon Co.*,
  2016 WL 7324154 (C.D. Cal. Dec. 8, 2016) ..................................................................... 14

*Mattson v. Home Depot, Inc.*,
  No. 11cv0533 AJB (BLM), 2012 WL 2342948 (S.D. Cal. June 20, 2012) ......................... 17

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ......................................................................................................... 12

DEFENDANTS HCL TECHNOLOGIES  LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

*Meachum v. Knolls Atomic Power Lab.*,
    554 U.S. 84 (2008) ........................................................................................................ 23

*Millbrook v. IBP, Inc.*,
    280 F.3d 1169 (7th Cir. 2002) .................................................................................... 17

*Mir v. Greines, Martin, Stein & Richland*,
    No. 2:14-4132-CAS  FFMX, 2015 WL 4139435,  at *19 (C.D. Cal. Jan. 12,
    2015), *aff'd*, 676 F. App'x 699 (9th Cir. 2017) ........................................................ 20

*Mundy v. Household Fin. Corp.*,
    885 F.2d 542 (9th Cir. 1989) ...................................................................................... 21

*Petrov v. Hebert Rsch., Inc.*,
    No. C14-0754JLR, 2015 WL 4508708 (W.D. Wash. July 24, 2015) ......................... 19

*Pottenger v. Potlatch Corp.*,
    329 F.3d 740 (9th Cir. 2003) ...................................................................................... 24

*Rose v. Wells Fargo & Co.*,
    902 F.2d 1417 (9th Cir. 1990)............................................................................... 22, 25

*Rowell v. Sony Pictures Television Inc.*,
    743 F. App'x 852 (9th Cir. 2018).............................................................................. 13

*Scheitlin v. Freescale Semiconductor, Inc.*,
    465 F. App'x 698 (9th Cir. 2012).............................................................................. 18

*St. Francis Coll. v. Al–Khazraji*,
    481 U.S. 604 (1987) ................................................................................................... 19

*Stott v. Contra Costa Cmty. Coll. Dist. Bd. of Trustees*,
    9 F.3d 1553 (9th Cir. 1993) ........................................................................................ 18

*Stout v. Potter*,
    276 F.3d 1118 (9th Cir. 2002)..................................................................................... 23

*Stroman v. W. Coast Grocery Co.*,
    19 F.3d 29 (9th Cir. 1994) .......................................................................................... 13

*Velez v. Janssen Ortho*,
    LLC, 467 F.3d 802 (1st Cir. 2006) ............................................................................ 13

*Villiarimo v. Aloha Island Air, Inc.*,
    281 F.3d 1054 (9th Cir. 2002)............................................................................... 14, 15

*White v. Wilson*,
    No. CV 16-8875  PA, 2018 WL 6175385  (C.D. Cal. Mar. 23, 2018), *aff'd sub*
    *nom. White v. Barrett*, 812 F. App'x 629 (9th Cir. 2020) ........................................ 24

DEFENDANTS HCL TECHNOLOGIES  LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY
JUDGMENT

*Zhang v. Honeywell Int'l, Inc.*,
   No. CV-06-1181-PHX-MHM, 2009 WL 3175063 (D. Ariz. Sept. 29, 2009), *aff'd sub nom. Liaosheng Zhang v. Honeywell Int'l, Inc.*, 442 F. App'x 288 (9th Cir. 2011)............13, 19, 20

**OTHER AUTHORITIES**

Fed. R. Evid. § 801 ............................................................................................. 14, 15

42 U.S.C. § 2000e (Title VII) .....................................................................*passim*

42 U.S.C. § 1981 (Section 1981) ................................................................*passim*

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     <u>INTRODUCTION</u>**

Serial Plaintiffs and job applicants Gregory Handloser and Cerafin Castillo ("Plaintiffs") have no basis for their claim that HCL America, Inc. and HCL Technologies Ltd. ("HCL") failed to hire them on the basis of their race, national origin, or citizenship status under Title VII or Section 1981. Six months ago, Plaintiffs failed to prove that HCL had a common-pattern-and-practice of such discrimination in their unsuccessful bid for class certification, and now, proceeding on their individual claims, they fail to create a triable issue of fact that they suffered from disparate treatment or disparate impact when they sought employment with HCL.

Plaintiffs' claims of discrimination rest largely on speculation. Their disparate treatment claims for national origin (non-Indian) discrimination under Title VII fail because, for each of the times they contacted HCL, they either cannot articulate a *prima facie* failure-to-hire claim or they cannot prove that HCL's legitimate business reasons for not selecting them was pretext for discrimination. Plaintiffs' claims of race discrimination against non-South Asians fail for the same reason, especially because Plaintiffs have no evidence of *race*-based bias (separate from their national origin claim) under Title VII, let alone Section 1981's more stringent "but-for" causation standard. Similarly, Plaintiffs lack evidence of discrimination based on their citizenship status (non-visa holders) to maintain their Section 1981 claims—indeed, some positions Plaintiffs applied to expressly excluded the visa-holders that they allege are favored by HCL.

Plaintiffs also fail to state a *prima facie* claim for disparate impact on the basis of race and national origin under Title VII. Plaintiffs fail to identify and isolate specific, facially-neutral employment practices that were applied to them, fail to identify any race-based disparate impact or utilize an appropriate applicant pool to show disparate impact, and fail to show causation between the challenged practice and alleged disparate impact.

**II.    <u>FACTUAL BACKGROUND</u>**

  **A.    <u>HCL's Business</u>**

HCLT, an India-based technology company, and HCLA, its U.S. subsidiary, provide

1   information technology ("IT") consulting services. Ex. 1, ¶ 2.[1] The majority of HCL employees

2   are in the "delivery" part of the business, which means they perform client services. Ex. 1 ¶ 8. The

3   two other primary areas of HCL's business are "sales," which sells HCL services to prospective

4   clients, and corporate "enabling" functions like finance and accounting. Ex. 1 ¶ 5. HCL's service

5   business is organized by different lines of business, such as Engineering Research & Development

6   and IT Infrastructure Management Services, and industry-specific verticals, such as Aerospace and

7   Financial Services. *Id.*

8   **B.   Handloser's Five Contacts with HCL**

9

10

11

12

13

14

15

16

17   **1.   Contact No. 1 ("Networking Opportunity"):
       *Handloser Circulated Resume but No Job Existed***

18

19

20

21

22

23

24

25   Hayaran sent Handloser's resume to Abhishek Shankar, who did not

26   act on Handloser's resume because he had no open roles. Ex. 3, ¶ 2, Ex. 4, ¶ 2.

27   _____

28   [1] All citations are to the Appendix of Evidence filed herewith in support of Defendants' Motion for
     Summary Judgment.

2.      ***Contact No. 2 ("Manufacturing Call"):***
        ***Handloser Lacked Necessary Expertise and the Job was Not Filled***

Anand Venkatraman, the head of sales for manufacturing, received Handloser's resume and asked his sales recruiter, Reshmi Roy, to arrange a call ("Manufacturing Call"). Ex. H 52:20-53:2.

3.      ***Contact No. 3 ("UTC Aerospace Job"):***
        ***Billington, Handloser's Former Colleague, Did Not Recommend Him***

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7        Shreyans Shrimal, an Indian applicant, received the offer for UTC Aerospace Job. Ex. H

8   77:10-12,  80:1-4.

9

10

11

12

13

14   Ex. I-1; Ex. I 137:13-138:2,  138:3-15.   Satapathy interviewed both of Billington's  recommended

15   candidates.  He declined Upchurch who he felt had had "strong product knowledge," but would

16   "struggle on many fronts," including  "learn[ing]  about services industry," "understand[ing]  where

17   the new opportunities  could be – sustenance, aftermarket, mfg. eng. etc.," and "learn[ing]  our

18   global  delivery  model and adapt[ing]  to that." Ex. 7 ¶¶ 3-5, Ex 7-1. Satapathy found Shrimal to be

19   the better candidate, especially  given he had already been managing  one of HCL's relevant client

20   accounts for his then-employer, E-Infochip.  *Id*. ¶ 3, Ex. 7-1. Ex. H 78:22-79:20.

21                                                                Ex. I 139:16-140:1,  Ex. I-2.

22

23

24   Ex. H 81:6-9, 82:3-19;  Ex. I 156:15-157:12,  157:25-159:6 Ex. I-4 (emailing  Satapathy that

25   assuming  "Gokul is as strong as I hope and have already  seen, I would like to move on Gokul

26   immediately  for Aero").

27                                                                Ex. B 126:2-20,  128:9-10,  131:19-

28   132:11,  132:18-23,  Ex. B-5 (response no. 4).

DEFENDANTS HCL TECHNOLOGIES  LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY
JUDGMENT

4.    *Contact No. 4 ("UTC Industrial Job"):*
      *After Five Interviews, Handloser was Not the Most Qualified Candidate*

[redacted]

Before his interview with Satapathy, Bhavani Ganesan, a sales recruiter at HCL, evaluated whether Handloser was affordable. [redacted] [redacted] Ex. 7 ¶ 9, Ex. 7-3; Ex. B 144:10-22, 162:15-163:25.   Suresh Kothandaraman from Human Resources said this was "too high."   Ex. 7 ¶ 9, Ex. 7-3.

[redacted]

The same day, Satapathy emailed his feedback Billington,  noting seven pluses, such as "good track record in sales," "been an engineer," "clarity of thoughts," "informed about HCL," and "composed

and articulate," and four minuses, including "lack of engineering services sales experience" and a question of whether Handloser would be "excited enough about the role . . . which has limited scope / hence stability – we need somebody for long haul, there has been a lot of turnover in the account team." Ex. 7 ¶ 7, Ex. 7-2. Satapathy's "final recommendation" was to "GO" forward with Handloser's candidacy through the next steps: (1) confirmation from Kothandaraman that HCL "can afford him;" (2) "concurrence" from Shiv Kalkur in the industrial "delivery team"; and (3) "input[]" from Hirren Turakhia, the Global Head of Industrial (within the ERS line of business). Ex. 7 ¶ 8, Ex. 7-2.

Satapathy involved Kalkur and Turakhia because the job entailed selling the industrial work that fell within Turakhia's responsibility as the head of industrial and had a dotted reporting line to Turakhia. Ex. 7 ¶ 6. While the position reported to Billington (and in turn, Satapathy) to give UTC the convenience of one account team at HCL, the person hired for the UTC Industrial Job would directly impact Turakhia's business revenue within industrial, not Satapathy's revenue within aerospace. *Id.*

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7                                              Ex. I 198:5-10, 199:19-202:14; Ex. I-5; Ex. 7 ¶ 10.  Turakhia

8   added that "[w]hat we need" on the sales team is an experienced person for "Building Systems and

9   Technologies ["BST"] business driven & ERS [Engineering Research Solutions] driven value

10  propositions."  Ex. I-5.  He told Billington to "let Greg be on hold" and asked him to please "let me

11  suggest couple of profiles" with a BST industry profile.  Ex. I-5.

12

13

14

15

16

17

18

19

20

21

22          **5.     *Contact No. 5 ("A&D NN Job"):***
            ***Van Deventer Declined Handloser Based on Past Work Experience***
23

24          Handloser's fifth and final contact with HCL was initiated by recruiter Cynthia Matthew on

25  June 26, 2018.  Ex. A ¶ 28, Ex. B-8 ¶ 9.

26

27

28

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY
JUDGMENT

[black redaction box, lines 1-5]

After speaking with Handloser, Matthew asked Van Deventer whether he wanted to consider Handloser for the open sales position in the Aerospace and Defense industry (the "A&D NN Job"). Ex. 5 ¶ 5. Van Deventer declined. *Id*. ¶¶ 1, 4. Since they had previously worked together at Infosys, Van Deventer was aware of Handloser's experience and selling capabilities. *Id*. Van Deventer knew Handloser lacked aerospace experience, relied on client "relationships" to make sales, and lacked the ability to "build credibility" with clients based on "solution details" and "consultative sales," which require "real time content problem solving with customers." Ex. 5 ¶¶ 2, 5; Ex. H 197:2-10, 198:5-14. The position was not open to visa-holders and Van Deventer later hired a Caucasian individual who is a U.S. Citizen. Ex. 5 ¶¶ 3, 6. Handloser admits that Van Deventer never said anything inappropriate or discriminatory to him in their initial call in October 2017. Ex. B 85:11-86:1, 86:2-23.

### C.   Castillo's Contacts with HCL

[black redaction box, lines 18-20]

#### 1.   *Castillo was Not Qualified for the Network Security Position at UCSF*

In December 2017, Sunil Kumar Jha, HCL's delivery manager for client UCSF, opened a requisition for a network security position ("Network Security Position"). Ex. 8 ¶ 4. The position was for a "senior" and "lead" network engineer within HCL's career level 3 ("L3"). Ex. 8 ¶ 6; Ex. H 166:1-15, Ex. H-1. Per UCSF's requirement, the position was not open to visa-holders. Ex. 8 ¶ 8. UCSF also requested to interview applicants recommended by HCL and make the final decision as to which, if any, should be hired. Ex. 8 ¶¶ 7-8.

On January 3, 2018, Saimani Surisetty, an HCL recruiter, contacted Castillo about the

1  Network Security Position.  Ex. L-2 ¶ 4.



23  158:4-18.  There was only one Network Security Position for UCSF throughout 2018, although a

24  few versions of job descriptions existed. Ex. 8 ¶¶ 3, 11-13.  Jha created a new version of the job

25  description on March 27, after HCL could not find a qualified candidate within its budget.  Ex. 8 ¶

26  13, Ex. 8-3. Jha titled this job description "Sr. Network Operations Engineer" and removed two

Juniper-related certifications in the hopes of attracting more potentially qualified candidates. *Id.*[2]

While job descriptions varied, the Network Security Position did not change, nor did the CISSP

preference that Castillo admits he could not satisfy. Ex. 8 ¶¶ 3, 11.

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████ Ex. 8 ¶ 22; Ex. H 145:13-146:10, 175:2-4, 176:5-7.  The individual

declined the offer and HCL subsequently canceled the position because it could not find qualified

candidates that met UCSF's approval.  Ex. 8 ¶ 22; Ex. H 177:11-13, 179:10-20.

### 2.  *UCSF Rejected Castillo for the Network Refresh Job*

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

_____

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

Case No. 5:19-cv-01242-LHK  (VKD)

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY
JUDGMENT

1    ███████         Ex. L-2 ¶ 7, Ex. L 121:12-122:2.   Preethy Muthuswamy, an HCL recruiter, received

2    Castillo's resume from LinkedIn and sent it to Jha.  Ex. 8 ¶ 19.  Jha saw Castillo's resume

3    identified "technical refresh of LAN/WAN/WLNA misconfigurations" as one of his current job

4    responsibilities.  Ex. 8 ¶ 19.  This sounded similar to a new opening that Jha had with UCSF so he

5    asked his direct report, Yatin Sadhwani, to conduct a technical interview with Castillo.  *Id*. The

6    new opening was for a network refresh project for UCSF's Benioff Children's Hospital in Oakland

7    ("BCHO") ("Network Refresh Job").  Ex. 8 ¶ 18.  The Network Refresh Job required a lower level

8    of skill and responsibility than the Network Security Job.  *Id*.  ██████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████

███████████████████████████████████████████

III.     **LEGAL ARGUMENT**

Plaintiffs allege that HCL failed to hire them for certain jobs because of disparate treatment on the basis of national origin and race under 42 U.S.C. § 2000e ("Title VII"), and on the basis of race and citizenship under 42 U.S.C. § 1981 ("Section 1981"), as well as because of disparate impact on the basis of race and national origin under Title VII. Ex. A, ¶¶ 51-63.

Plaintiffs' Title VII and Section 1981 claims are analyzed under the same *McDonnell Douglas* burden-shifting framework that applies to their Title VII claims. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028, 1028 n.5 (9th Cir. 2006). The material distinction, however, is that Plaintiffs bear a heavier burden on their Section 1981 claims, which require them to prove that "**but for**" race or citizenship, they would not have suffered the loss of a legally protected right. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (rejecting the Title VII "motivating factor test" for § 1981 claims).

To prevail on their failure-to-hire claims, each Plaintiff first must make a *prima facie* show that: (1) he belongs to a protected class; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) after being rejected, the position remained open and HCL continued to seek applicants from persons of Plaintiff's qualifications. *McDonnell Douglas Corp.*, 411 U.S. 792, 802 (1973). If HCL then articulates that Plaintiff was "rejected, or someone else was preferred, for a legitimate non-discriminatory reason," Plaintiff can defeat summary judgment only by presenting "specific and significantly probative evidence" demonstrating that HCL's reasons are pretext for discrimination. *Stroman v. W. Coast Grocery Co.*, 19 F.3d 29 (9th Cir. 1994).

As explained below, Plaintiffs' claims cannot withstand summary judgment.

A.     **Plaintiffs Cannot Prove National Origin Disparate Treatment under Title VII**

1.     *Handloser Cannot State a Claim for the Networking Opportunity*

Handloser cannot make even a *prima facie* claim regarding his Networking Opportunity with Hayaran. He merely sent his resume, unsolicited. The undisputed evidence is that he was not

1   applying to any specific job and, in fact, no job existed. With these facts, Handloser cannot state a

2   claim for failure-to-hire. *Lesane v. Aloha Airlines, Inc.*, 226 F. App'x 693, 697–98 (9th Cir. 2007)

3   (affirming summary judgment where plaintiff "did not show that the position was open at the time

4   he submitted his application" nor did he offer evidence of other applicants' qualifications); *Rowell*

5   *v. Sony Pictures Television Inc.*, 743 F. App'x 852, 854 (9th Cir. 2018) (affirming dismissal of

6   complaint because no open position existed); *Velez v. Janssen Ortho*, LLC, 467 F.3d 802, 806–09

7   (1st Cir. 2006) (holding plaintiff's letters stating she was "interested" in "any position available"

8   was insufficient to constitute an application to a "discrete, identifiable position").

9               **2.    *Handloser Cannot State a Claim for the Manufacturing Call***

10              Handloser also cannot articulate a *prima facie* case for the Manufacturing Call he had with

11  Venkatraman after Hayaran circulated his resume at HCL. Handloser has no evidence that

12  Venkatraman had a specific job opening, that Handloser was qualified for such an open position, or

13  that such a position remained open while HCL continued to seek applicants. The undisputed

14  evidence is that Venkatraman did not hire anyone after Handloser's Manufacturing Call. Ex. H

15  Dep. 61:2-17. *Zhang v. Honeywell Int'l, Inc.*, No. CV-06-1181-PHX-MHM, 2009 WL 3175063, at

16  *5 (D. Ariz. Sept. 29, 2009), *aff'd sub nom. Liaosheng Zhang v. Honeywell Int'l, Inc.*, 442 F. App'x

17  288 (9th Cir. 2011) (holding plaintiff failed to make *prima facie* case where she could not dispute

18  that positions "were subsequently canceled by [Defendant] and went unfilled"). Additionally,

19  Handloser has zero evidence of pretext to rebut Venkatraman's reason for not hiring him: he lacked

20  the experience to articulate HCL's technical propositions for the marketplace. *See, e.g.*,

21  *Mankaruse v. Raytheon Co.*, 2016 WL 7324154 at *6 (C.D. Cal. Dec. 8, 2016) (finding that closing

22  a position without filling it was a legitimate non-discriminatory reason for not hiring plaintiff).

23              **3.    *Handloser Cannot Show Pretext Regarding the UTC Aerospace Job***

24              Handloser cannot prevail on his claim for discrimination regarding the UTC Aerospace Job

25  because he has no admissible evidence of pretext. Billington—who is Caucasian, American, and

26  represented by Handloser's lawyers in his own suit against HCL—admits he did not consider

27  Handloser for the job. He ranked Handloser third out of five candidates and testified he "didn't

28  recommend Greg" and that Handloser was "never really a candidate." Ex. I 135:5-24, Ex. I-1.

Handloser does not allege that Billington discriminated against him. Ex. B 151:10-12. Rather, he claims that Billington (and Billington alone) told him that Satapathy "directed [Billington] to hire the Indian candidate." Ex. B 151:1-9; 193:16-23, 199:22-200:3. This self-serving testimony is inadmissible double-hearsay and uncorroborated even by Billington, who denies telling Handloser about an "Indian" candidate. Ex. I 153:1-154:5 ("I wouldn't have said Indian, I would have said a guy being transferred from another account"). Such inadmissible and uncorroborated, self-serving testimony does not defeat summary judgment. Fed. R. Evid. § 801; *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (recognizing that at summary judgment, only evidence that "could be presented in an admissible form" at trial may be considered); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (holding Ninth Circuit will not deny judgment based on "'uncorroborated and self-serving' testimony").

### 4.   *Handloser Cannot Show Pretext Regarding the UTC Industrial Job*

Handloser cannot prevail on his discrimination claim regarding the UTC Industrial Job because he cannot present specific and substantial evidence of pretext to rebut HCL's legitimate business reasons for not selecting him. Turakhia interviewed Handloser and declined to move forward. Ex. B 165:21-166:13, Ex. I 204:23-205:25, I-3 (Billington text to Handloser: "Hirren called a no-go"). He told Billington that Handloser's "impressive profile for large outsourcing deals and in IT centric value propositions" was redundant with Billington's own experience and skillset, so they should look for candidates with industrial experience for the UTC *Industrial* Job. Ex. I 198:5-10, Ex. I-5. Billington concedes that Turakhia's rejection of Handloser is based on his business-related judgment, not discrimination: "Hirren is showing here that his focus is on engineering and building systems. It is because he runs the building systems group and is only responsible for engineering services," whereas "my focus was not on just building systems and HVAC" because HVAC was only "one of 40 brands" within UTC. Ex. I 199:19-202:14.

Handloser once again offers inadmissible, uncorroborated, and self-serving testimony that Billington told him (Handloser) that Turakhia "pushed again to hire an Indian candidate." Ex. B 189:11-23, 193:16-23. This uncorroborated, self-serving hearsay fails to constitute sufficient evidence of pretext on summary judgment. Fed. R. Evid. § 801; *Villiarimo,* 281 F.3d at 1061

1  (rejecting "uncorroborated and self-serving" testimony as insufficient to create a genuine issue of

2  fact); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (same)

3          Separately, Billington alleges that Satapathy told him not to hire Handloser because of

4  "cultural misalignment," but this also fails to create a triable issue of fact for at least two reasons.

5  Ex. I 165:12-23;  174:4-176:7.  First, Plaintiffs cannot show how Satapathy's comment constitutes

6  specific and substantial evidence that *Turakhia* declined Handloser based on national origin.

7  Satapathy did not decline Handloser's candidacy, and Billington denies that Turakhia, who "called

8  a no-go" on Handloser, ever said Handloser was culturally misaligned.   Ex. I 211:12-212:12  ("Q:

9  [W]as any body else's feedback about Mr. Handloser that he was not culturally aligned with HCL?

10  A: No. That phrase was only from Siba. . . .").

11          Second, even if Handloser could prove Satapathy's comment influenced HCL's decision as

12  to Handloser's candidacy for the UTC Industrial Job (which he cannot), he lacks substantial and

13  specific evidence to demonstrate that Satapathy's alleged "cultural misalignment" comment to

14  Billington was motivated by discrimination.   In Handloser's recording of Satapathy's interview,

15  Satapathy used the phrase "cultural alignment" and explained HCL's culture as entrepreneurial:

16          [E]nterprising and very entrepreneurial company . . . when we hire people from structured
            industry background and from those kinds of cultures, they get frustrated because these
17          things just don't happen.  They send an email and things don't happen.  Next, it's
            frustrating . . . but that's a reality.  A lot of times things don't happen fast enough at the
18          pace that you would like . . . . Now, that's the kind of culture that it is today.  The process
            will change, they will become better, but the core DNA, I doubt if that is going to change . .
19          . This company loves engineering . . . an entrepreneurial and enterprising company, and
            people who can bring this new thinking and can back that up, so not just bringing in
20          innovation  . . . but back that up with a proactive business case and on your own go and
            build your partnerships, don't work only in the defined boundaries . . . .  How does that
21          sound for you and your personality?

22  Ex. M at 11; *see also* Ex. H 117:2-15 (citing culture as customer relationships of trust and

23  transparency and other factors defined on HCL's website).

24          Billington, too, offered a neutral definition of cultural alignment.  He explained cultural

25  alignment as a "catchall phrase that covers conflict and missed expectations that are extreme,"

26  generally "driven by missed expectation of responsiveness, of quality of communication, of quality

27  of understanding."  Ex. I 229:16-232:2 (also stating it was "normal" to discuss "across the

28

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY
JUDGMENT

industry"). He even testified that *he* considered cultural alignment as a reason he favored Handloser for the job: "because of cultural alignment I wanted the two North American individuals to fill the two senior North American roles that had to communicate with senior North American executives every day." Ex. I 27:19-29:2. He explained that cultural alignment does indicate preference based on national origin, which he knew was prohibited at HCL, but that, for example, he might rate poorly a "person whose French accent was extremely strong and had to be easily understood . . . but not because they were French or because they were Canadian." Ex. I 89:6-25, 84:22-86:21.

Handloser likewise testified that cultural alignment referred to workplace styles and habits, not national origin. Handloser explained that a common piece of client feedback has been a recognition of a "a difference in Western and Eastern thinking" in terms of "notions of time," "results versus process orientation," and "hierarchy thinking," so client partners like himself try to have cultural alignment and blending of cultures. Ex. B 121:13-122:7; *see also id.* 161:7-20 (describing "offshore culture" as referring "time zone" because "much of the deliveries" and "even the presale support is offshore" and it was "common to have a call at 1:00, 2:00 in the morning" or "4:30, 5:00, 5:30 in the morning" to do work).

Because Handloser cannot produce specific and substantial evidence that Turakhia's decision not to hire Handloser was motivated by his national origin, Handloser cannot defeat summary judgment on his UTC Industrial Job failure-to-hire claim. *See Leap v. Bodman*, No. 06-CV-1593-BR, 2008 WL 1805576, at *12 (D. Or. Apr. 17, 2008) (granting summary judgment despite comments that there were cultural issues and plaintiff "doesn't really fit" because employer provided testimony that "fit" related to "most of the engineers working energy efficiency" and communication issues, which were unrelated to national origin discriminatory animus); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (reversing denial of summary judgment because there was no evidence that employer's comments based on "subjective criteria" was a "mask for discrimination" where comments were racially neutral).

### 5. *Handloser Cannot Show Pretext Regarding the A&D NN Job*

Handloser has zero evidence of pretext to rebut HCL's legitimate business reason for not

selecting him for the A&D NN Job. Van Deventer had previously worked with Handloser and knew his sales capabilities well enough to decide not to hire him. The decision had nothing to do with national origin, but Van Deventer's view that Handloser relied on "relationships" only and "lacked the ability to build credibility and drive differentiation based on solution details" and "real time content problem solving with customers." Ex. 5 ¶ 2. *See, e.g.*, *Cheeks v. Gen. Dynamics*, 22 F. Supp. 3d 1015, 1034–35 (D. Ariz. 2014) (finding defendant established legitimate business reason for not hiring based on personal knowledge and relevant work experience); *Mattson v. Home Depot, Inc.*, No. 11cv0533 AJB (BLM), 2012 WL 2342948, at *4 (S.D. Cal. June 20, 2012) (recognizing "any inference of discrimination is undermined when the decision-maker is a member of the same protected class").

### 6. *Castillo Cannot State a Claim Regarding the Network Security Job*

Castillo cannot make a *prima facie* failure-to-hire claim for the Network Security Job because he admits he was not qualified for the position. He admitted that "I didn't qualify" for the job given it preferred a CISSP certification that he lacked, because "[w]ell, I'm not an info sec guy." Ex. L 54:14-55:1, 92:6-93:12, 95:23-96:8. Circumstantial evidence further corroborates Castillo's own admission, and HCL's conclusion, that Castillo was not qualified for this job. For example, Castillo admits his "typical salary" was $100,000 at the time he applied to HCL, fifty percent less than the market salary for the qualified candidate. Ex. 8 ¶ 16. Additionally, when he applied to the Network Security Job, Castillo's most recent job was equivalent to an L1 job at HCL, two levels lower than L3 classification of the Network Security Job. Ex. 8 ¶ 17; Ex. 2 ¶ 5.

Castillo also has zero evidence of pretext to overcome HCL's legitimate business reason for not selecting him after he failed his technical interview with Joseph. He concedes "I don't know" if HCL favored Indian candidates over him and that nobody acted in a manner that was inappropriate or discriminatory toward him. Ex. L 77:13-23. His only grievances against HCL for the Network Security Job relate to the alleged "unprofessionalism" he experienced because Joseph allegedly did not have a "good grasp" on the technology and the recruiter "just ghosted me" by not following-up. Ex. L 69:22-70:25, 116:14-20. These general grievances, unrelated to his national origin, fail to support a discrimination claim. *See, e.g.*, *Hernandez v. City of Los Angeles*, 9 F.

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

App'x 636, 637 (9th Cir. 2001) (affirming summary judgment where plaintiff's evidence "consisted of criticisms of the process by which the LAPD selected its captains" and his "conclusion that he was better qualified" than those promoted); *Stott v. Contra Costa Cmty. Coll. Dist. Bd. of Trustees*, 9 F.3d 1553 (9th Cir. 1993) (affirming summary judgment where plaintiff only made "a challenge to the credibility of the declarants" who articulated their reasons for selecting other candidates but not showing discriminatory motive).

### 7.   *Castillo Cannot Show Pretext Regarding the Network Refresh Job*

Castillo cannot make a *prima facie* case for the Network Refresh Job because he cannot prove that he was qualified for the position. UCSF determined Castillo did not have the technical skillset required for the job. *See Scheitlin v. Freescale Semiconductor, Inc.*, 465 F. App'x 698 (9th Cir. 2012) (plaintiff's "subjective personal judgments of [his] competence alone" do not defeat summary judgment).

Castillo also cannot prove that HCL's legitimate nondiscriminatory reason for not hiring him (based on UCSF's technical interview) was pretext for discrimination. His only complaints are about HCL's alleged "unprofessionalism," such as Jha not escorting him out of the building, recruiters not following up with him about the status of his application, and phone interviewers being unprepared or uninterested. *See supra* II.C.2. He otherwise leaps to the speculative conclusion that "something's wrong" simply because "I'm trying to get the same, you know, into the same employer for three years through HCL, and every single time it's . . . no banana." Ex. L 205:10-24. These complaints of unprofessionalism and sheer speculation do not demonstrate any discriminatory motive on the part of HCL. *See Hernandez*, *supra*, 9 F. App'x at 637; *Zhang*, 2009 WL 3175063, at *6 (affirming summary judgment based on allegations that "Plaintiff was not hired and that she happens to . . . belong to a certain" protected class).

### B.   Plaintiffs Cannot Prove Race-Based Disparate Treatment Under Title VII or Section 1981

Plaintiffs' claims of race discrimination fail under Title VII's "motivating factor" standard as well as Section 1981's more demanding "but-for" standard. *See* Ex. A, ¶¶ 53, 58. Plaintiffs attempt to treat race and national origin interchangeably, but this is insufficient to support a claim

for race discrimination.   Race and national origin are distinct protected classes and treated as such. *See*, *e.g.*, *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000) (finding that "Asian" origin was insufficiently granular to meet the definition of "national origin" under Title VII); *Petrov v. Hebert Rsch., Inc.*, No. C14-0754JLR, 2015 WL 4508708, at *1 (W.D. Wash. July 24, 2015) (holding the "Ninth Circuit has held that evidence of an employer's actions toward a broad racial category of persons is inapposite to a national origin discrimination that implicates only a subgroup of that category," and excluding race-based evidence to prove national origin discrimination); *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987) (holding plaintiff could not base section 1981 claim on "nation of his origin").

## 1.   *Handloser Cannot Prove Race-Based Disparate Treatment*

Handloser's factual claims are based on national origin discrimination, not race. For example, he alleges that Billington was directed to hire the "Indian" candidate, not the South Asian candidate. Ex. B 189:11-23 ("pushed again to hire an **Indian** candidate"); *see also* Ex. B 156:2-14 (alleging hires are "folks **from India** on visas"). Billington clarifies that there is no race claim beyond than the national origin claim: "I keep calling them Indians. The reason for that is, within HCL, **there's no other South Asians except Indians**." Ex. I 126:12-16;  *see also* Ex. I 15:11-16:14 (describing employee pipeline for North American jobs "was also dominated by **Indian** nationals"), Ex. I 165:24-166:8 (alleging Handloser rejected "because they were American, not **Indian**"). Because Handloser cannot show any evidence that race-based discriminatory animus motivated any of HCL's interactions with him, his race-based disparate treatment claims under Title VII and Section 1981 fail.  *See*, *e.g.*, *Mir v. Greines, Martin, Stein & Richland*, No. 2:14-4132-CAS FFMX, 2015 WL 4139435, at *19 (C.D. Cal. Jan. 12, 2015),  *aff'd,* 676 F. App'x 699 (9th Cir. 2017) (dismissing Section 1981 claim because the plaintiff's allegations "relate only to his national origin" and not race).

While HCL believes Handloser lacks admissible evidence that race discrimination was a motivating factor in HCL's actions as required under Title VII, at a minimum, Handloser lacks evidence of "*but-for*" race discrimination under Section 1981. *See Comcast Corp.*, 140 S. Ct. at 1019 (rejecting the Title VII "motivating factor test" for Section 1981 claims). Handloser cannot

prove that but-for an unlawful action, he would have been selected for a job any of the five times he connected with HCL. Indeed, there is significant evidence that HCL would have reached the same decision about Handloser in Handloser's five interactions with HCL *even if* race were not a factor (indeed, it never was a factor): (1) when he circulated his resume as a Networking Opportunity, no job existed to hire him; (2) during the Manufacturing Call, Venkatraman found Handloser lacked expertise for a potential role that was never filled; (3) Billington, whom Handloser admits did not discriminate, ranked him third out of five candidates and did not recommend him for the UTC Aerospace Job; (4) Turakhia declined Handloser in favor of a candidate with industrial sales background that Handloser lacks for the UTC Industrial Job; and (5) Handloser was not considered by his former Caucasian colleague because of his sales skills and lack of aerospace background for the A&D NN Job. As such, Handloser's Section 1981 race claim independently of his Title VII race claim.

## 2.  *Castillo Cannot Prove Race-Based Discrimination*

Castillo testified "I have no idea" if HCL discriminated against him on the basis of race. As explained above (*supra* Section III.A.6 to III.A.7), Castillo has zero evidence of discriminatory animus in any of his interactions with HCL. He concedes as much, merely speculating that he assumes "there's something wrong" because he tried to get a job "for three years through HCL" without success. Ex. L 205:10-24. This is insufficient to defeat summary judgment on his race discrimination claims under Title VII and Section 1981. *See, e.g., Zhang, supra,* 2009 WL 3175063, at *6 (affirming judgment where evidence was plaintiff's membership in protected class).

## C.  Plaintiffs Cannot Prove Citizenship Discrimination Under Section 1981

Plaintiffs allege citizenship discrimination under Section 1981 based on their status as non-visa-holders. Ex. A ¶ 53. Although Plaintiffs treat their citizenship allegations as interchangeable with their national origin and race claims, this is insufficient because, like race and national origin, citizenship is a distinct and separate protected category. *See, e.g., MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1146 (3d Cir.1988) (recognizing "national origin discrimination and citizenship discrimination are distinct phenomena" and that liability can be imposed on one without the other).

They have no evidence that any of HCL's decisions were pretext for citizenship discrimination under the applicable "but-for" discrimination standard. In fact, Handloser and Castillo each sought one job—the A&D NN Job for Handloser and Network Security Job for Castillo—that expressly **excluded visa-holders** from consideration. Plaintiffs' claims of discrimination favoring visa-holders in the A&DNN Job and Network Security Job necessarily fail.

Handloser also cannot prove a claim of but-for citizenship discrimination on his four other contacts with HCL. The only evidence of citizenship discrimination that he presents is vague testimony that Satapathy preferred visa-holders over Handloser because visa-holders are half the cost. Ex. B at 183:21-184:2. This is inadmissible hearsay and, even if it were admissible, it fails to carry the day under the but-for causation standard because Handloser cannot show that, but-for this alleged bias, he would have been hired for the UTC Industrial Job. As explained above, Satapathy did not reject Handloser's application for the UTC Industrial Job—he advanced it to the next interview stages. Additionally, HCL offered the position to a permanent resident (green card holder), not a visa-holder, undermining any claim of citizenship discrimination favoring visa-holders. Ex. H 119:3-11. *Mundy v. Household Fin. Corp.*, 885 F.2d 542, 546 (9th Cir. 1989) (favorable treatment of someone in plaintiff's protected class "undercut" discrimination claim).

Castillo likewise has no evidence that but-for his citizenship status, he would not have been denied the Network Refresh Job. Indeed, he testified "I have no idea" whether HCL discriminated on the basis of citizenship. Ex. L 85:5-15. HCL relied on UCSF's evaluation that Castillo lacked the necessary skills and Castillo cannot show that UCSF was motivated by his citizenship status or that UCSF was even aware of his citizenship status.

**D.** **Plaintiffs Fail to State a Race or National Origin Disparate Impact Claim**

Plaintiffs allege five policies and practices at HCL result in disparate impact against non-South Asian and non-Indian candidates: (1) reliance on visa-holders to staff U.S. positions; (2) a practice of "applying for a large number of work visas for South Asian individuals;" (3) "internal employee allocation practices;" (4) "retaining contract workers who are predominantly South Asian and Indian"; and (5) HCL's "hiring-decision making process, as a whole." Ex. A ¶¶ 20, 62.

Plaintiffs cannot state a *prima facie* claim of disparate impact. Unlike Plaintiffs' disparate

treatment claims of discrimination above, which require proof of discriminatory motive, their Title VII disparate impact claim based on race and national origin must challenge "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977). To establish a prima facie claim of disparate impact discrimination, Plaintiffs must: (a) identify the specific employment practice being challenged; (b) show significant disparate impact on a protected group of which the plaintiffs are a member; and (c) prove causation with "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). HCL may then "either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists." *Id.*

### 1.    *No Specific, Neutral Practices to Which Plaintiffs were Subjected*

The practices Plaintiffs rely on cannot support a disparate impact claim because they are not "facially neutral." *Teamsters*, 431 U.S. at 335 n. 15. Plaintiffs' allegations that HCL has a practice of (1) relying on visa-holders to staff positions; (2) applying for a large number of visas for South Asians; and (3) retaining South Asian and Indian contract workers are expressly premised on an alleged *intentional* preference for Indian workers, not a neutral practice.

Additionally, Plaintiffs fail to isolate the specific policies responsible for any alleged disparate impact. Plaintiffs paint their disparate impact claim with the broadest of brush strokes, capturing nearly every personnel-related decision at a staffing company with thousands of employees. *See, e.g.*, Ex. A ¶ 62 ("hiring decision-making process, as a whole"). This does not pass muster. The Ninth Circuit already held that Plaintiffs "cannot attack an overall decision-making process" but must instead "identify the particular element or practice within the process" that causes a disparate impact. *Stout v. Potter*, 276 F.3d 1118, 1121–25 (9th Cir. 2002) (affirming summary judgment on disparate impact claim). Plaintiffs' burden of isolating the specific employment practice is "not a trivial one" and serves to avoid holding employers liable for the "myriad of innocent causes that may lead to statistical imbalances." *Meachum v. Knolls Atomic*

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

*Power Lab.*, 554 U.S. 84, 100-01 (2008).  Plaintiffs fail to isolate the "several discrete elements" contained within each of their challenged practices.  *Stout*, 276 F.3d at 1124.  For example, as this Court observed, HCL has "dramatically different hiring procedures depending on the job" opening in question, and each job opening typically includes several discrete stages of evaluations and decision-making.  Ex. N at 13:14-15.  Plaintiffs' failure to isolate and identify specific discrete elements of HCL's practices is fatal to their claim.  *See*, *e.g.*, *Stout*, 276 F.3d at 1124 (recognizing that the "overall interview screening process included several discrete elements" where screening panel members "independently evaluated every applicant" and plaintiffs did not argue that process "cannot be isolated for analysis"); *Bagwell v. CBS Broad. Inc.*, No. CV 19-8423 DSF (ASX), 2021 WL 2497949, at *12 (C.D. Cal. May 7, 2021) (granting summary judgment for failure to isolate and identify specific practices where plaintiffs alleged "the transfer of older employees" and "the offer of [voluntary buy-outs in exchange for resignations] based on age").

Finally, Plaintiffs fail to state a claim for disparate impact because they cannot prove they were subjected to each of practices they challenge.  For instance, the A&D NN role and the Network Refresh Position excluded visa-holder applicants, thus, Plaintiffs' challenge to "HCL's reliance on South Asian visa holders" and HCL's "appl[ication] for a large number of work visas" could not have had a disparate impact on Plaintiffs on these occasions.  Likewise, Plaintiffs cannot prove that they competed against any internal or contract applicants to be subjected to policies of "internal employee allocation practices" and "retraining contract workers."  *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) (affirming summary judgment because plaintiff "must show that he was subject to the particular employment practice with the alleged disparate impact").

### 2.    *No Disparate Impact*

Plaintiffs' statistical evidence fails to meet the bar for articulating a *prima facie* disparate impact claim based on race or national origin.  As a threshold matter, Plaintiffs lack evidence of disparate impact based on *race*, which is fatal to their race-based disparate impact claim.  Dr. Neumark, Plaintiffs' expert, expressly states "I focus my analysis Indians and non-Indians, rather than South Asians and non-South Asians." Ex. 9 ¶ 7 n.1.

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT

In addition, even for their national origin claim, Plaintiffs' "comparison pools are not proper." *White v. Wilson*, No. CV 16-8875 PA (AGRX), 2018 WL 6175385, at *5–6 (C.D. Cal. Mar. 23, 2018), *aff'd sub nom. White v. Barrett*, 812 F. App'x 629 (9th Cir. 2020). Dr. Neumark compares the percent of HCL's hires into all L3 and above jobs who are Indian with the census data about the percent of Indian employees in the U.S. working in two IT-related industries. Ex. 10 ¶¶ 3, 4. But the Ninth Circuit considers "general population statistics an inadequate proxy for the pool of potential applicants" for jobs like those at HCL "seeking applicants . . . requiring special skills." *White*, 2018 WL 6175385, at *6 (granting summary judgment for lack of disparate impact proof where plaintiff relied on demographics of accountants/auditors across the United States as "simply not sufficiently related to the applicant pools" for two financial specialist jobs).

### 3.  *No Causation Shown Between Challenged Practices and Alleged Impact*

Plaintiffs fail to make a *prima facie* case of disparate impact because they cannot prove the disparate impact they allege is caused by the policies they challenge. Dr. Neumark notes that approximately 58% and 61% of the people HCL hired in Career Levels 3 and above were Indian. Ex. 9 at 22, ¶ 7(a). He then calculates statistically significant disparities in favor of Indians because, according to certain ACS census data, only 9.61% of U.S. workers in similar occupations are Indian. Ex. 9 ¶ 7(a). Dr. Neumark's conclusions flow entirely from his use of the ACS census data, rather than HCL's applicant data, as a benchmark for his analysis. Ex. 9 ¶ 12; Ex. 10 ¶¶ 57, 58. If he had used a proper benchmark derived from HCL's actual applicant data, which shows that the percentage of Indians who applied for jobs is far greater than the ACS survey would suggest, then he would have found **no** statistical disparities in the number of Indians hired by HCL. Ex. 10 ¶¶ 59-62; Ex. 11 ¶¶ 15, 26. In fact, based on HCL's actual applicant pool as a benchmark, HCL hires *fewer* applicants of Indian origin than expected. Ex. 10 ¶ 62.

Plaintiffs' statistical analysis fails to show that the disparities they observe are caused by the practices that they challenge. *Rose*, 902 F.2d at 1424 (third prong of claim is to prove causation with "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."). Dr. Neumark does not evaluate the impact of specific practices at HCL to

prove causation. The statistical disparities he finds flow from a simple comparison of HCL demographics to nationwide demographics. This analysis does not prove HCL's practices caused the disparate impact. To the contrary, the disparities "can be explained by nondiscriminatory factors," such as the pool of applicants who express interest in jobs at HCL is disproportionately of Indian origin. Ex. 10 ¶ 62; *Rose*, 902 F.2d at 1425 (granting summary judgment because plaintiffs' statistics "showed only that . . . persons over 50 within [the division] were terminated at a higher rate than younger [] employees [in the division]," and defendant's statistics showed that could be explained by the fact that "older persons tended to occupy the duplicative management positions eliminated by Wells Fargo during the reorganization").

## IV.   CONCLUSION

For these reasons, this Court should grant HCL's motion for summary judgment and dismiss Plaintiffs' claims in their entirety with prejudice.


DATED: August 23, 2021

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


By: */s/ Roshni C. Kapoor*
    DOUGLAS J. FARMER
    BRIAN D. BERRY
    CHRISTOPHER McCRACKEN
    ROSHNI C. KAPOOR
    KEVIN HA

Attorneys for Defendants
HCL TECHNOLOGIES LTD. and HCL
AMERICA, INC.

47393451.6

DEFENDANTS HCL TECHNOLOGIES LTD. AND HCL AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT